**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO.: CV 06-3564 JRT/FLN**

| | |
|---|---|
| Wanda Stella,<br><br>                    Plaintiff,<br><br>v.<br><br>Jeffery Anderson, Pete Kohman, et al,<br><br>                    Defendant. | **PLAINTIFF'S MEMORANDUM**<br>**IN SUPPORT OF**<br>**DEFAULT MOTION**<br><br>**[ORAL ARGUMENT REQUESTED]** |

## I.  INTRODUCTION

Plaintiff submits this Memorandum of Law in Support of his application for an award of attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3).

## II.  FACTS OF DEFAULT

The following facts relevant to this motion are contained in the court's file.  Pursuant to Fed. R. Evid. 201, Plaintiff requests that the court take judicial notice of the following facts:

1.    Plaintiff filed the Summons and Complaint with the Clerk of Court on September 1, 2006. (*See Docket Item 1*)

2.    On October 12, 2006, Plaintiff served Defendant Jeffery Anderson (hereinafter "Anderson") with the Summons and Complaint through Metro Legal Services by personal service.  (*See Docket Item 2*)

3.    On October 12, 2006, Plaintiff served Defendant JD Investments (hereinafter "JDI") with the Summons and Complaint through Metro Legal Services by personal service to Jeffery Anderson its president. (*See Docket Item 7*)

4.   On October 12, 2006, Plaintiff served Defendant Wildcat Investments (hereinafter "Wildcat") with the Summons and Complaint through Metro Legal Services by personal service to Jeffery Anderson its president. (*See Docket Item 8*)

5.   To date, Defendants Anderson, JDI or Wildcat have not filed an Answer or otherwise defended against the claims as stated in the Complaint.

6.   On December 29, 2006 Plaintiff filed with the Clerk of Court and Affidavit of No Answer pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. (*See Docket Item 15*)

7.   On December 29, 2006 Plaintiff filed with the Clerk of Court an Application for Entry of Default. (*See Docket Item 14*)

8.   On January 3, 2007, the Clerk of Court entered Default against Defendants Jeffery Anderson, JDI and Wildcat. (*See Docket Item 17*)

9.   On January 3, 2007 Defendants Pete Kohman, Money Tree, Foreclosure Solutions and Cornerstone Building Services filed an Application for Entry of Default against Cross Defendant Jeffery Anderson. (*See Docket Item 18*)

10.   On January 3, 2007 Defendants Pete Kohman, Money Tree, Foreclosure Solutions and Cornerstone Building Services filed an Affidavit of No Answer against Cross Defendant Jeffery Anderson. (*See Docket Item 19*)

11.   On January 4, 2007, the Clerk of Court entered Default against Cross Defendant Jeffery Anderson.

Laptop HD:Users:nicholas_slade:Documents:Office Projects:85008 Stella, Wanda:Motion for default:Memorandum.doc

## III.  ISSUES AND LEGAL ARGUMENT

**A.      DEFAULT**

Fed.R.Civ.P. 12 provides that a defendant shall file his or her answer or otherwise defend within 20 days of service. If a defendant fails to do so, a default judgment may be entered. Fed. R. Civ. P. 55(a) provides for entry of a party's default by the Clerk of Court upon notice by affidavit of a parties failure to plead or otherwise defend as provided by the rules.

Defendants Anderson, JDI and Wildcat were each served a copy of the summons and complaint on October 12, 2006. Pursuant to Rule 12(a) (1)(A) of the Federal Rules of Civil Procedure each is required to serve an answer to the summons and complaint within 20 days of such service.  To date Defendant Anderson, JDI, and Wildcat have not answered or otherwise defended in this matter.

Defendants Anderson, JDI and Wildcat are in default. Plaintiff has made this known to the Clerk of Court by her filing of an affidavit.

The Clerk of Court entered a default against Defendants Anderson, JDI and Wildcat.


**B.      DEFAULT JUDGMENT**

Fed.R.Civ.P. 55(b)(2) commits the entry of a default judgment to the discretion of the trial court FTC v. Packers Brand Meats,Inc., 562 F.2d 9, 10 (8th Cir. 1977).

Fed.R.Civ.P. 55 does not require a hearing before an entry of default. If the court determines that a defendant is in default, the factual allegations of the complaint will be taken as true. Thompson v. Wooster, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61 (2d Cir. 1981). This rule applies to cases seeking equitable as well as legal relief. Thompson v. Wooster, 114 U.S. 104, 110, 5 S.Ct. 788, 791, 29 L.Ed. 105 (1886).

Before obtaining a default judgment under Rule 55(b), the Plaintiff must "prove its entitlement to the requested damages," Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co., 239 F. Supp. 2d 26, 30 (D.D.C. 2002), and the Court "must conduct an inquiry to ascertain the amount of damages with reasonable certainty," Kingvision Pay-Per-View, Ltd. v. Lalaleo, 429 F. Supp. 2d 506, 513 (E.D.N.Y.2006).

## i.  FACTUAL ALLEGATIONS OF COMPLAINT.

1.      On or about January 15, 2005, Plaintiff was facing foreclosure on her home and residence for the past 11 years.

2.      At the time her home went into foreclosure, Plaintiffs was 4 months behind in her monthly payments of $583.12 per month.

3.      At the time her home went into foreclosure, Plaintiff owed US Bank approximately $2,435.76 for missed monthly installments and late fees for an accelerated balance of $63,666.97.

4.      At the time that her home went into foreclosure, Plaintiff also owed approximately $22,800.00 to a first time homebuyers assistance program, however Plaintiff was not in default on this obligation and if she had retained the house until June 16, 2005, she would have been under no obligation to repay the loan..

5.      Based on information and belief the estimated market value of the property for tax purposes as of January 2, 2005 was $160,500.00. Therefore Plaintiff had approximately $74,034.00 in equity in the property.

6.      Desperate to come up with a way to save her home from foreclosure, Plaintiff with parties who assured Plaintiff that she would be able to retain her home and the equity she had built up over years of mortgage payments.

7.      Numerous representations were made to Plaintiff that a real estate transaction was being structured to help Plaintiff avoid foreclosure and keep her home and to pay off other outstanding debt.

8.      On February 25, 2005, when she arrived at the closing, Defendant Anderson and several persons affiliated with Defendants were present.

9.      During the closing, Plaintiff was unrepresented by any licensed or unlicensed professionals of any kind.  Plaintiff is an unsophisticated consumer and signed when and where she was told to do so by the Defendant Anderson and Defendants' affiliates present at the closing.

10.     Plaintiff expressed to Defendant Anderson and others present at the closing that she was leery of the transaction she was being induced to enter into.

11.     Defendant Anderson and Defendants' affiliates present at the closing indicated that, despite her misgivings, Plaintiff had to sign then and there because of the pending foreclosure action on her home.

12.     Defendants' affiliates drafted a warranty deed, which purported to convey title to Defendant Anderson.  It was this deed that Plaintiff was induced to sign based upon Defendants' false promises.

13.     The HUD-1 indicates that Defendant "JD Investments" received $32,077.06 from the closing out of the equity in Plaintiffs home.   *See* Complaint Exhibit D.

14.     An "invoice" for the $32,077.06 paid to "JD Anderson Investments (an attempted alter ego of Defendant Anderson) indicates the exorbitant, improper fees reaped by Defendant Anderson at the closing, including "Gift Funds" of $8,600.00, and an "Investor Fee" of $10,000,00.  The invoice also indicates that Defendant Anderson received $11,531.64 in

"pre-paid mortgage" payments (Plaintiff's rent for 12 months), as well as $1,301.42 and $644, for taxes and insurance, respectively. *See* Complaint Exhibit E.

15.     Defendant charged Plaintiff for one year of taxes and insurance because it was understood that Plaintiff was in fact still the owner of the house.

16.     The HUD-1 also includes and item at line 518, titled "Invoice", in the amount of $6,840, the purpose of which is unknown to Plaintiff.

17.     At the time of this "sale," Plaintiff never intended to transfer her right of possession to the property, rather Plaintiff agreed to Defendant Anderson purported lease of the Fremont Property to Plaintiff with an option to repurchase the property after one year because she was lead to believe by Defendants that it was the only way she could avoid losing both title and possession to her house.

18.     The lease called for $960.00 per month in rent, which Defendant Anderson took from Plaintiff's proceeds on the sale. The repurchase price in the option was $121,600.  These terms made the contract a one-year mortgage with a balloon payment.

19.     The terms of the agreement indicated that Plaintiff had paid rent through December 2006. *See* Complaint Exhibit F.

20.     The $960.00 in "rent" Defendant Anderson planned to charge exceeded by $376.88, the $583.12 per month that Plaintiff had been unable to pay to US Bank in mortgage payments.

21.     Defendants knew that Plaintiff had been unable to make the $583.12 monthly payment on her mortgage and that she had stated that she could not afford more than $800.00 per month.  Defendants intentionally deceived Plaintiff by failing to tell her what her payment would be under the transaction until the high pressure situation of the "closing."

Defendants had unique knowledge of this material fact and intentionally and repeatedly made representations to Plaintiff, such as that Defendants were helping Plaintiff to stay in her home, that were inconsistent with the increase in payment.

22.     Defendants deceived Plaintiff as to the amount of the monthly payment with the intent that she be forced into a situation with little or no possibility of successfully complying with the terms and thereby ensuring that Defendants would ultimately gain possession of her house through the legal system.

23.     Defendants failed to provide any of the disclosures required by the Truth in Lending Act, 15 U.S.C. § 1601 et seq. and 12 C.F.R. § 226 et seq., including notices of the right to rescind.

24.     Defendant Anderson provided no notice of cancellation to Plaintiff, as required under Minn. Stat § 325N.

25.     At no time did Defendant Consultants or Defendant Anderson verify that Stella could make payments and buy back her home.

26.     Defendant Anderson's "fees" constitute unconscionable finance charges, in excess of 8% of the sale price of the Fremont Property thereby requiring the Defendants to comply with the additional requirements of HOEPA, 15 U.S.C § 1639.

27.     The end result of the transaction, intended by the Defendants, was that Defendants received real property valued at $160,500.00 for approximately $99,780.00, and Plaintiff was left with no home and none of her equity.

28.     On or about May 26, 2005, Defendant Anderson wrote to Plaintiff regarding an insurance inspection, wherein Defendant Anderson stated he had received a letter and photos of the property and referred to the house as " your home." See Complaint Exhibit G.

29.    The letter Defendant Anderson referred to was from North Star Mutual Insurance Co. and listed numerous items, which needed to be fixed or the insurance would be cancelled.

30.    Defendant Anderson further stated that failure by Plaintiff to make the repairs would result in "your home owners insurance" being cancelled.

31.    Defendant Anderson's charging Plaintiff for the taxes and insurance on the house as well as making regular reference to the house as Plaintiff's demonstrate that the intent of the Defendants was to transferring title to the property only as security for the loan while still retaining an ownership and possession.

32.    On or about March 1, 2006, Defendant Anderson sent a letter to Plaintiff, falsely claiming he had not received rent payments January and February 2006, and purporting to charge Plaintiff late fees of $192.98.  Defendant Anderson also demanded payments of rent for March 2006.  Defendant Anderson's letter threatened Plaintiff with eviction. Defendant Anderson's letter told Plaintiff to make her check payable to "Wildcat Investments."

33.    The January and February "rent" payments, which were prepaid, were, under the Contract, specifically supposed to be held in reserve for Plaintiff's benefit.

34.    On March 8, 2006, Defendant Anderson initiated an eviction action the Hennepin County Housing Court, and sought to have Plaintiff evicted.

35.    On May 8, 2006, Defendant Anderson's eviction action was dismissed with prejudice and expunged.  In the Dismissal order, the Honorable Judge Patricia Kerr Karasov noted that because the Contract between Plaintiff and Defendant Anderson appeared to "fall under the rubric of either a foreclosure reconveyance transaction or an equitable mortgage,"

rather than a lease, Defendant must proceed under an action for ejection or foreclosure, and therefore dismissed Defendant's action for eviction.

36.   Plaintiff, despite her distress at being taken advantage of by Defendants and the threat to her home, has continued to faithfully make monthly payments to Defendant Anderson.

37.   Defendant Anderson granted an interest in his interest to Plaintiff's house to third party.

38.   Defendant Anderson has kept Plaintiff's monthly payments, and has defaulted on loans he took out against his interest in the Fremont Property.  Defendant Anderson's mortgagees have begun foreclosure proceedings against Defendant Anderson, seeking to foreclose on Defendant Anderson's ill-gotten interest in the Fremont Property, further threatening Plaintiff's ability to remain in her home.

### ii. DEFENDANTS ANDERSON, JDI AND WILDCAT ARE LIABLE TO PLAINTIFF FOR DAMAGES.

By this motion, the Plaintiff seeks an award of default judgment with regard to the defaulting defendants' liability towards Plaintiff.   Based on the factual allegations of the Complaint, which are taken as true for the purposes of this motion, Defendants Jeffery Anderson, JD Investments and Wildcat Investments are liable to Plaintiff on each of Plaintiff's claims.

### COUNT 1. EQUITABLE MORTGAGE

The transaction between Plaintiff and Defendant Anderson and/or other Defendants was a financing arrangement, which constituted an equitable mortgage ("equitable mortgage"), not withstanding Defendants' actions and language to the contrary.

In general, "a deed absolute in form is presumed to be, and will be treated as, a conveyance unless both parties in fact intended a loan transaction with the deed as security

only." But, "when the real nature of the transaction between the parties is that of a loan, advanced upon the security of realty granted to the party making the loan, it may be treated as an equitable mortgage, without regard to the actual form of the instrument of conveyance." <u>Peterson v. Johnson</u>, 720 N.W.2d 833, 838 (Minn.App. 2006) A transaction may be construed as an equitable mortgage if both parties intended a loan transaction with the deed as security only and not as a sale. <u>Ministers Life & Cas. Union v. Franklin Park Towers Corp.</u>,307 Minn. 134, 138, 239 N.W.2d 207, 210 (1976). The intent of the parties must be "ascertained by the written memorials of the transaction and the attendant facts and circumstances." Id.

Prior to the transaction, Plaintiff held title to the property and conveyed it to Defendants as security for financial assistance in the form of a loan to avoid foreclosure. The value of the property exceeded the amount of money transferred to Plaintiff. Despite formal language to the contrary, it was the stated intent of both parties to enter into a loan secured by real property. Because it was the stated intent of both Plaintiff and Defendant that the purpose of the transaction was to assist Plaintiff in retaining ownership and possession of her home it is clear that the intent of the parties was to create an equitable mortgage.

This position is further supported by the actions of the Hennepin County Housing Court. In order to circumvent the consumer protections afforded a mortgagor under Minnesota and Federal law and to dispossess Plaintiff, Defendants wrongfully and unlawfully prosecuted an eviction action in Hennepin County Housing Court. The action was dismissed with prejudice and expunged by the court, which recognized that the transaction "f[e]ll under the rubric of either a foreclosure reconveyance transaction or an equitable mortgage," rather than a lease, so that Defendants would be required to foreclose the equitable mortgage in accordance with the mortgage foreclosure laws in order to divest Plaintiff of her interest in her home.

-10-

Defendants did not appeal this dismissal and the judgment for dismissal is now final. The Court should declare the transaction between Plaintiff and Defendants an equitable mortgage.

## COUNT 2: VIOLATIONS OF THE TRUTH IN LENDING ACT AND THE HOME OWNER'S EQUITY PROTECTION ACT

The Truth in Lending Act, 15 U.S.C § 1601 *et seq.* and the Federal Reserve Board Regulations promulgated thereunder at 12 CFR § 226.1 *et seq.* ("Regulation Z") (collectively "TILA") are intended to protect consumers prior to placing a mortgage lien on their house by requiring that certain disclosures be given to the consumer prior to the mortgage transaction.

The TILA "is remedial in nature, and the substance rather than the form of credit transactions should be examined in cases arising under it." Hickman v. Cliff Peck Chevrolet, Inc., 566 F.2d 44, 46 (8th Cir. 1976). Moreover, in interpreting agreements possibly covered by the TILA, "the practices of the trade, the course of dealing of the parties, and the intention of the parties in addition to specific contractual obligations" must be considered. Joseph v. Norman's Health Club, Inc., 532 F.2d 86, 90 (8th Cir. 1976). The legislative history of the TILA shows that Congress was aware that "some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish," Mourning v. Family Publications Service, Inc., 411 U.S. 356, 365, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318 (1973).

On or about February 25, 2005, Plaintiff as part of the equitable mortgage transaction entered into a consumer credit transaction with Defendants Anderson and/or others in which the

extended consumer credit was subject to a finance charge and which was initially payable to Defendants in more than four installments.

The loan made to Plaintiff, a consumer whose ownership interest in her principal dwelling was subject to the security interest within the meaning of Regulation Z, § 226.1(b) and § 226.2(a)(11), and was "consumer credit" within the meaning of Regulation Z § 226.2(a)(12), i.e., was credit offered or extended to a consumer primarily for personal, family or household purpose, and was subject to the Truth In Lending Act, 15 U.S.C. 1601 et seq. and Regulation Z. This consumer credit transaction was not exempt from TILA as a "residential mortgage transaction" within the meaning of 15 U.S.C. § 1602(w), in that the mortgage transaction did not finance the acquisition or construction of her house.

The Home Ownership and Equity Protection Act ("HOEPA") is designed to prevent predatory lending practices targeted at vulnerable consumers. HOEPA regulates a special class of closed-end loans made with high interest rate or high costs and fees. HOEPA is an amendment to the Truth in Lending Act, codified at 15 U.S.C. § 1639 and Regulation Z §§ 226.31-32.

A loan is a HOEPA loan if the total fees and points for Plaintiff's mortgage, as defined by 15 U.S.C. § 1602(aa)(1)(B) were in excess of "Eight (8%) percent of the total loan amount," as defined by 15 U.S.C. § 1602 (aa)(1B) and/or the annual percentage rate at the time of consummation exceeded by more than ten percentage points the yield on treasury securities having comparable maturities at the time the mortgage loan was made. Mitchell v. Beneficial Loan & Thrift Co., 463 F.3d 793 (8th Cir. 2006)

The loan to Plaintiff was $99,780, and the fees were ~$45,168.86. These fees were well in excess of the 8% limit and the effective annual percentage rate charged on the loan was

28.26%, exceeding the LIBOR rate of 3.13% by more than 10%, the mortgage was therefore covered by HOEPA, 15 U.S.C. § 1639.

Defendants Anderson, and/or others, failed to provide Plaintiff with: A Truth in Lending disclosure as required by TILA, including among other facts, the amount financed, the finance charge, the annual percentage rate, the timing of payments, the fact that a security interest is being taken as required under the Truth In Lending Act in violation of 15 U.S.C. §1638.

Defendants Anderson, and/or others failed to provide Plaintiff with any of the disclosures specified under the terms of HOEPA which must be given three days prior to the consummation in violation of 15 U.S.C § 1639 (a) and (b). Additionally, the term of the contract which was less than five years included a one-time balloon payment of $121,000 to be made at the end of the term in violation of 15 U.S.C. 1639(e).

As a result of Defendant Anderson, JD Investments and Wildcat Investments' violations of TILA and HOEPA, Defendants are liable to Plaintiff as provided by 15 U.S.C. § 1640.

## TILA RIGHT OF RECISSION

Under TILA and HOEPA, a consumer whose lender fails to provide the disclosures described above retains the continuing right to rescind the transaction until the third business day after receiving both the notice and all "material" disclosures described above, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3), for up to three years after the date of consummation. Gaona v. Town & Country Credit, 324 F. 3d 1050 (8th Cir. 2003)

Plaintiff's consumer credit transaction with Defendant Anderson and others was subject to Plaintiff's right of rescission under TILA as described in 15 U.S.C. § 1635 and Regulation Z, § 226.23. Defendants Anderson, and/or others also failed to provide Plaintiff a conspicuous notice of her right to rescind the mortgage loan transaction as required by 15 U.S.C. § 1635(a)

and Regulation Z § 226.23(a) and (b). Pursuant to 15 U.S.C. 1635, Plaintiff retained her right of rescission, and gave notice of her exercising of that right in writing in her complaint. Elliott v. Itt Corp., 764 F. Supp. 102 106 (N.D.Ill. 1991)

Upon receiving the notice of rescission, the creditor is required to perform first and cancel all security interests and return all monies. FDIC v. Hughes Dev. Co., 938 F.2d 889, 890 (8th Cir. 1991) Defendant Anderson, and/or others failed to promptly void all security interests and within 20 days of receiving the notice of rescission failed to return all money or property given as earnest money, downpayment or otherwise, in violation of 15 U.S.C. § 1635(b).

In addition to the right of rescission, pursuant to 15 U.S.C. § 1635(g) Defendant Anderson, JD Investment and Wildcat Investments' are also liable to Plaintiff as provided in 15 U.S.C. 1640 for the violation of 15 U.S.C. § 1635.

Pursuant to 15 U.S.C. § 1635, ownership of the property vests in Plaintiff without any further obligation to pay for it as Defendant Anderson, and/or others also failed to take possession of the property within 20 days of notice.


### COUNT 3: Minn. Stat. §§ 325N.01-.18

The State of Minnesota has recognized the need to protect consumers facing foreclosure from unscrupulous predators and in 2004 enacted laws governing the actions of foreclosure purchasers at Minn. Stat. 325N.10 to 325N.18.

As a result of the Defendants' actions described above, Defendants have violated numerous and multiple provisions of Minn. Stat. §§ 325N, including but not limited to 325N.12, 325N.14, 325N.15, 325N.17, amongst others.

Laptop HD:Users:nicholas_slade:Documents:Office Projects:85008 Stella, Wanda:Motion for default:Memorandum.doc

Plaintiff is a "foreclosed homeowner" as that term is defined by Minn. Stat. 325N.10, Subd. 2, because she is or was the owner of residential real property that is her primary residence and her mortgage on the property was in foreclosure.

Defendant Anderson is a "foreclosure purchaser" as that term is defined by Minn. Stat. 325N10, Subd. 4, as he has acted as the acquirer in more than one foreclosure reconveyance during any 24 month period.

The transaction is a "foreclosure reconveyance" as that term is defined by Minn. Stat. 325N.10, Subd. 3, because the transaction involved the transfer of title to real property by a foreclosed homeowner during a foreclosure proceeding by transfer of interest from the foreclosed homeowner and there was a promise of subsequent conveyance of the interest back to the foreclosed homeowner, which allowed the foreclosed homeowner to possess the real property following completion of the foreclosure proceeding.

At the time of entering into the foreclosure reconveyance, Defendant Anderson failed to verify and demonstrate that Plaintiff had the reasonable ability to pay for the subsequent reconveyance of the interest back, in that the terms of the contract required her to pay a higher monthly payment than she had been paying and been unable to make at the time foreclosure proceeding where commenced. The terms include a balloon payment of $121,600, which was nearly double the $63,666.00 of the loan being foreclosed on, in violation of 325N.17(a)(1). Defendant Anderson also failed to comply with the requirements of HOEPA as previously noted in violation on 325N.17(a)(4).

Defendant Anderson represented that by entering into the transaction he was helping Plaintiff to "save the house", in violation of 325N.17(d)(3).

Laptop HD:Users:nicholas_slade:Documents:Office Projects:85008 Stella, Wanda:Motion for default:Memorandum.doc

At the time of entering into the transaction Defendant Anderson was required to provide Plaintiff with numerous disclosures including but not limited to the Notice of Cancellation described at 325N.14, which Defendant failed to provide.

Minn. Stat. 325N.12 requires that every contract governing a foreclosure reconveyance include certain specific terms, notice regarding the signing of any deed prior to the right to cancel the contract has ended, notice of right to cancel with the specific day the right to cancel must be given by, and instructions on how to give notice of cancellation.

Because Defendant Anderson did not provide Plaintiff with a Notice of Cancellation as required and the contract did not contain the notice regarding the signing of the deed prior to the right of cancellation expiring, Plaintiff retains the right to cancel the contract.

Prior to the expiration of the right to cancel the contract, Defendant Anderson requested and had Plaintiff sign a deed conveying interest in the property, recorded that conveyance with the County Recorder and then conveyed, transferred or encumbered the property to a third-party in violation of 325N.17(f).

As a result of Defendant Anderson and others violations, Defendants are liable to Plaintiff pursuant to Minn. Stat. §325N.18 and Minn. Stat. § 8.31.


## COUNT 4:  PLAINTIFF'S CAUSE UNDER MINN. STAT. § 8.31

Defendants actions in violation of Minn. Stat. §325N.10 to 325N.17 are violations of Minn. Stat. 325F.69 and all remedies under Minn. Stat. 8.31 are available, because a private right of action under section 8.31 by a foreclosed homeowner is in the public interest." 325N.18 subd. 1.

## COUNT 5: CONSUMER FRAUD ACT—Minn. Stat. 325F.68 et seq.

Minnesota law prohibits fraud and deceptive practice in the sale of goods or services.

Minn. Stat. § 325F.68-.69.  Minnesota law provides as follows:

> Unlawful Practices, Subd. 1. - Fraud, Misrepresentation, Deceptive Practices.
> The act, use or employment by any person of any fraud, false pretense, false
> promise, misrepresentation, misleading statement, or deceptive practice, with the
> intent that others rely thereon in connection with the sale of any merchandise
> whether or not any person has in fact been mislead, deceived, or damaged
> thereby, is enjoinable as provided herein.

Minn. Stat. § 325F.69, Subd. 1.

This statute as a consumer protection law, is remedial in nature, and is to be liberally

construed in favor of protecting the consumer.  State by Humphrey vs. Alpine Air Products, Inc.,

490 N.W. 2d 888, 892 (Minn. App. 1992); affirmed 500 N.W.2d 788, (Minn. 1990).  Further,

this statute reflects a clear legislative policy encouraging aggressive prosecution of statutory

violations.  State by Humphrey vs. Phillip Morris, Inc., 551 N.W.2d 490, 495 (Minn. 1996).

Plaintiff's ownership interest in her house is "merchandise" within the meaning of Minn.

Stat. §325F.68 Subd. 2, which includes real estate, loans and services within its definition.

Defendants' representations, conduct and omissions were intended to induce Plaintiff to

enter into the transaction with the intent to gain possession of her house and strip her of its

equity.

Defendants' representations and conduct had the tendency to deceive and were deceptive,

misleading and unfair because Plaintiff was, among other things, induced to believe that

Defendants intended to help her stay in her home and that Defendants would provide terms

which would make this possible and thereby save Plaintiff's home and equity.

-17-

Defendants' representations and conduct had the tendency to deceive and were deceptive, misleading and unfair because they did not make those disclosures relating to residential mortgages required by law that Plaintiff was entitled to, and Defendants intended the transaction to result in their ownership of Plaintiff's house and her equity, thereby stripping her of both.

Defendants' acts, statements and/or omissions were misleading and deceptive, and done with the intent that Plaintiff would rely on those acts, statements and/or omissions to her detriment.

Defendants have committed multiple, separate violations of Minn. Stat. § 325F.69 by the above described sale/leaseback equity stripping scheme, which was deliberately structured to fail.  This scheme is a deceptive practice and false promise. Further, Defendants have committed multiple separate violations of Minn. Stat. § 325F.69 by making misrepresentations and false or misleading statements in the course of this scheme, and by intentionally making false promises as part of this scheme.

As a result of Plaintiff's reliance on Defendants fraud misrepresentations and deceptive practices, Plaintiff has suffered damages and is entitled to recover damages from Defendants.

## COUNT 6: UNIFORM DECEPTIVE TRADE PRACTICES ACT

The Uniform Deceptive Trade Practices Act contains Minn. Stat. 325D.44, subdivision 1, which provides, in part, that:

> Subdivision 1. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> > (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
> > (9) advertises goods or services with intent not to sell them as advertised;

Laptop HD:Users:nicholas_slade:Documents:Office Projects:85008 Stella, Wanda:Motion for default:Memorandum.doc

(13) engages in any other conduct which similarly creates a likelihood of
confusion or misunderstanding.

The conduct of Defendants described above constitutes multiple, separate violations of
Minn. Stat. § 325D.44, subd. 1 (5), (9) and (13) by representing that the sale/leaseback deal they
offered Plaintiff would stop the foreclosure process and allow the homeowner to remain in the
home; by significantly increasing the purchase price, monthly rent, and service charges charged
by Defendants for engaging in this deal once Plaintiff had committed to the deal; and by
engaging in the equity stripping scheme described above that created a likelihood of confusion
and misunderstanding by Plaintiff.

## COUNT 7: UNJUST ENRICHMENT

Defendants have received a benefit of money, of ownership and of a claim to the equity
in property as a result of the equity-stripping scheme described above.
Defendants have knowingly accepted such benefits.

Under the above-described circumstances, it would be inequitable and an unjust
enrichment for them to retain those benefits.

## COUNT IV: UNCONSCIONABILITY

Defendant Anderson has purported to claim fee ownership in Plaintiff's property as result
of the above described equity stripping scheme that is both procedurally and substantively
unconscionable.

Laptop HD:Users:nicholas_slade:Documents:Office Projects:85008 Stella, Wanda:Motion for default:Memorandum.doc

## COUNT V: COMMON LAW FRAUD

Defendants, by their above-described actions, made knowing and material misrepresentations to Plaintiff, with the intent of deceiving Plaintiff and inducing Plaintiff to act on those misrepresentations.  Plaintiff did rely on and act in reliance upon, Defendant's deceits.

Defendants intentionally falsely represented to Plaintiff that they wanted to structure a financial transaction to help Plaintiff keep her house and retain her equity.

Defendants intentionally failed to tell Plaintiff that Defendants intended to structure the transaction so as to cause Plaintiff to lose her home and her equity to them. Defendants instead lead Plaintiff to believe that the intent of the transaction was to help Plaintiff stay in her home.

Defendants intentionally induced Plaintiff to sign a warranty deed and other documents by representing that the documents were merely a part of the transaction necessary for Plaintiff to avoid foreclosure and retain her home and equity. These misrepresentations and omissions constitute misrepresentations of material facts.

Plaintiff relied upon Defendants representations.

As a result, Defendant has suffered damages in the loss of thousands of dollars in income and home equity, as well as in the purported loss of title to her home.


C.      **DAMAGES**

**Count 1.  Equitable Mortgage.**

Count 1 does not provide for actual damages but is a request for a declaration that the transaction was a disguised mortgage transaction and created an equitable mortgage.

**Count 2. TILA/HEOPA**

Because Defendant Anderson violated the TILA he is liable to Plaintiff pursuant to 15 U.S.C. §1640, which in pertinent part provides for the recovery of: actual damages, 15 U.S.C. §1640(1); statutory damages of twice the amount of the finance charge, but not less than $200 or greater than $2,000, 15 U.S.C. §1640(2)(A)i&iii; and in the case of a violation of §1639 (HOEPA) an amount equal to the sum of all finance charges and fees paid by the consumer unless the creditor demonstrates that the failure to comply is not material, 15 U.S.C. § 1640(4). In the case of a successful action TILA provides for the recovery of costs and reasonable attorney fees.

As a result of Defendants actions they are liable to Plaintiff for the following

1.  Plaintiff has no actual damages under TILA, because in this matter no disclosures were made of the amount of the finance charges, so Plaintiff could not rely on the disclosures to her detriment and has therefore not suffered any actual damages.

2.  The finance charge imposed on Plaintiff was $33,340.[1] As twice the amount of the finance charge exceeds $2,000, Plaintiff is limited to $2,000.

3.  Defendants' violations of HOEPA results in a liability of $56,229.02.[2]

**Count. 3.  Minn. Stat. § 325N, Mortgage Foreclosures.**

As a result of Defendants' violations of Minn. Stat. § 325N, they are liable to Plaintiff for damages pursuant to Minn. Stat. 325N.18, Subd.1, which provides for the recovery of actual damages, as a violation of Minn. Stat. §325F.69 and Minn. Stat. 8.31. Additionally, the court

---

[1] Plaintiff received the benefit of $99,780 and was required to pay back $133,120 by making 12 payments of $960 and a balloon payment of $121,600.
[2] Plaintiff *paid* $11,520 in finance charges and $44,709.02 in fees.

may award exemplary damages in any amount. If the Court finds that exemplary damages are appropriate the award shall not be less than 1 ½ times actual damages, Minn. Stat. § 325N.15, Subd. 2.

The remedies provided under Minn. Stat. § 325N.18 are cumulative and do not restrict any other remedy that is otherwise available, Minn. Stat. § 325N.18 Subd. 3.

As a result of Defendants' actions Plaintiff suffered actual damages in the amount of $56,229.02, in that she paid $11,520 in finance charges and $44,709.02 in fees in an attempt to save her house from foreclosure, only to have Defendant Anderson then attempt to evict her from her house.

The Court should also find that exemplary damages are appropriate and award at least $84,343.53 as 1 ½ times the actual damages pursuant to Minn. Stat. § 325N.15, Subd. 2.

The Minnesota Court of Appeals in an extensive examination of the application of punitive damages in Minnesota stated:

> The purpose of exemplary damages is "to both punish and deter according to the gravity of the act giving rise to a punitive damage award. Punitive damages are imposed to punish the defendant and to deter him, and others like him, from intentional wrongs and deliberate disregard of the safety or rights of others. The focus lies on the defendant's wrongful conduct that must be deterred, not the specific outcome of the conduct.
> Punitive damages implement this philosophy by economically deterring wrongful interference with the rights of others. Absent punitive damages, criminal prosecution and tainted goodwill remain the only sanctions moderating the conduct of individuals or companies that would seek to wrongfully deprive others of their property through fraud or trickery. Trickery and deceit are more reprehensible than negligence."
>
> Molenaar v. United Cattle Co., 553 N.W. 2d 424, 429 (Minn. App. 1996) (internal citations omitted)

The language of the statute does not set a standard of wrongdoing for the Court to use to determine at what level of wrongdoing exemplary damages become appropriate, leaving it solely

to the discretion of the Court.[3] This case presents a perfect example of the need for exemplary damages. Through fraud and trickery, Defendant Anderson attempted to take advantage of Plaintiff and strip her of the one real asset she had, the equity in her home, at a time when she was in a particularly vulnerable due to the stress of facing possible foreclosure. Rather than actually attempting to legitimately assist Plaintiff in saving her home, Defendants simple took the home and the equity.

Exemplary Damages are appropriate and the Court should award at least $84,343,53.


**D.   PLAINTIFF'S SUIT WAS SUCCESSFUL, AND THEREFORE PLAINTIFF AS THE PREVAILING PARTY IS ENTITLED TO AN AWARD OF ATTORNEY'S FEES AND COSTS.**

In this matter, each of the consumer protection statutes authorizes the award of attorneys fees and cost to a prevailing consumer.  The purpose of this fee shifting provision is to attract competent counsel.  Zagorski v. Midwest Billing Services, Inc., 128 F.3d 1164, 1167 (7th Cir. 1997).

Upon the finding of a TILA violation, an award of fees is mandatory, though the amount of the award lies in the discretion of the court. Dryden v. Lou Budke's Arrow Finance Co., 661 F.2d 1186, 1191 and n. 7 (8th Cir. 1981). See also, Purtle v. Eldridge Auto Sales Inc, 91 F.3d 797, 802 (6th Cir. 1996) cert. denied, 520 U.S. 1252.

---

[3] The legislature has the power to determine when punitive damages may be awarded in a specific cause of action. See, e.g., Minn.Stat. § 363.071 (1992) (in Human Rights Act case, "[p]unitive damages shall be awarded pursuant to section 549.20"); Minn.Stat. § 325B.08 (1992) (punitive damages may be awarded in Beer Brewers and Wholesalers Act action if court finds defendant acted in bad faith); Minn.Stat. § 181.68, subd. 1 (1992) (in wage discrimination case, exemplary damages up to amount of unpaid wages may be levied at court's discretion); Minn.Stat. § 325C.03(b) exemplary damages may be awarded if willful and malicious misappropriation of trade secrets exists. See also Zawels v. Edutronics, Inc., 520 N.W.2d 520 (Minn.App. 1994)

An award of attorney's fees to a successful consumer under the TILA is designed to compensate the consumer for his role in privately enforcing the Act. <u>Murphy v. Ford Motor Credit Co.</u>, 629 F.2d 556, 561 (8th Cir. 1980) (Truth in Lending case).   Congress clearly intended that the prevailing consumer would recover his or her reasonable attorney's fees and costs.

In addition to TILA, violation of Minn. Stat. 325N are considered a violation of the Minnesota Prevention of Consumer Fraud Act which are to be enforced through the Minn. Stat.

In the instant case, Plaintiff is entitled to an award of attorney's fees and costs, since Plaintiff is the prevailing party.

## E.      ATTORNEY FEES AWARDS SHALL BE CALCULATED ACCORDING TO THE LODESTAR FORMULA.

In calculating an award of attorney's fees, the court must first begin with the "lodestar" figure, which is calculated by multiplying the hours reasonably expended times an allowed hourly rate.   See <u>Hensley v. Eckerhart</u>, 103 S.Ct. 1933, 1939 (1983) (viewing an award of fees under 42 U.S.C. §1988).   The burden is on the applicant to prove that the fee request is reasonable, with a strong presumption that the lodestar amount represents a fair and appropriate fee award.   <u>Hensley</u>, 103 S.Ct. at 1941.

Although <u>Hensley</u> was decided in the context of a civil rights case, the lodestar analysis is applicable to all cases involving an attorney fee shifting statute.   The Supreme Court has previously noted that, "We have stated in the past that fee shifting statutes' similar language is 'a strong indication' that they are to be interpreted alike."   <u>Independent Federation of Flight Attendants v. Zipes,</u> 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989) (quoting <u>Northcross v. Memphis Bd. Of Education</u>, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973).)

See also <u>City of Burlington v. Dague</u>, 112 S.Ct. 2638, 2641 (1992) (clean water act case applying lodestar analysis); <u>Simpson v. Sheahan</u>, 104 F.3d 998, (7th Cir. 1997) (civil rights case); <u>DeJesus v. Banco Popular de Puerto Rico</u>, 918 F.2d 232, 234 (1st Cir. 1990) (truth in lending case); <u>Piekarski v. Home Owners Savings Bank, F.S.B.</u>, 755 F. Supp. 859, 863 (D. Minn 1991) (retaliatory discharge case).

The determination of the allowable hours rests with the sound discretion of the trial court. <u>Hensley</u>, 103 S.Ct. at 1941.  A determination of the hourly rate by the trial court should consider a rate "commensurate which [counsel] could obtain by taking other types of cases."  <u>Tolentino</u>, 46 F.3d 645, 652 - 653 (7th Cir. 1995).


## IV.  CONCLUSION

In the present case, Plaintiff requests:

1. A declaration that the transaction was in fact an equitable mortgage;

2. An award of $2000.00 pursuant to 15 U.S.C. §1640(2)(A)i&iii;

3. An award of $56,229.02 pursuant to 15 U.S.C. § 1640(4), and Minn. Stat. 325N.18, Subd.1;

4. A finding that exemplary damages are appropriate and an award of at least $84,343.53.

5. A finding that Plaintiff is entitled to rescission of the security interest she granted in the property and that the Court direct that title to the property be restored to Plaintiff pursuant to 15 U.S.C. 1635 and Minn. Stat. 325N.13; and

6. An award of $16,993.75 for attorney's fees and costs.  See Affidavit of Time.

For the aforementioned reasons Plaintiff respectfully requests that this Court **GRANT** Plaintiff's Motion for Default Judgment.

Dated: ___January 24, 2007_____ .          Respectfully submitted,

                                            **BARRY & SLADE, LLC.**

                                                  /s/ Nicholas P. Slade
                                            By:_____
                                            Nicholas P. Slade, Esq.
                                            Attorney I.D.#270787
                                            2120 East Hennepin Ave, Ste. 195
                                            Minneapolis, MN 55413
                                            612.379.8800

                                            **ATTORNEYS FOR PLAINTIFF**